Maria S. RODRIGUEZ *v.* M. McDANIEL CO., INC.
& Liberty Mutual Insurance Company

CA 06–866                                                     252 S.W.3d 146

Court of Appeals of Arkansas
Opinion delivered March 7, 2007

*Tolley & Brooks, P.A.*, by: *Evelyn E. Brooks*, for appellant.

*Ledbetter, Cogbill, Arnold & Harrison, LLP*, by: *James A. Arnold, II*, and *Jeffrey D. Rickard*, for appellees.

BRIAN S. MILLER, Judge. On May 3, 2006, the Arkansas Workers' Compensation Commission affirmed a decision of the administrative law judge denying appellant Maria Rodriguez's

claim for workers' compensation benefits. Rodriguez alleges in this appeal that the Commission's decision is contrary to the facts and evidence and that the decision should be reversed. We affirm the Commission's decision.

M. McDaniel Company is a temporary staffing agency that is also known as "Temps for Hire." Stribling Packing is one of the regular clients for Temps for Hire. Rodriguez began working for Temps for Hire in March 2005 and on March 22, 2005, she was placed on temporary assignment at Stribling. Her assignment involved boxing wet wipes. The work area consisted of a two-and-a-half to three-foot area with just enough space for a person to stand. A conveyor belt moved the wipes down the line, and the workers stood on pallets in order to reach the line. As the wipes came down the line, they were placed on a metal table, and Rodriguez would grab the wipes from the table and place them in a box.

While attempting to grab some wipes, Rodriguez slipped and hit her right hip on the line. Rodriguez reported this to her supervisor and was transported to the emergency room at Northwest Medical Center. An x-ray came back normal and she was diagnosed with a contusion to the right hip and a lumbosacral sprain. She was prescribed Robaxin and Vicodin and released to return to work; however, she did not return to work.

On April 11, 2005, Rodriguez followed up her hospital visit with a visit to Dr. Timothy W. Yawn. Dr. Yawn examined her and found no muscle spasms, but he diagnosed Rodriguez with a lumbar strain or sprain and prescribed Anaprox-DS, an anti-inflammatory. Dr. Yawn recommended that she use moist heat on her back and neck, and gave her some exercises and stretches to perform twice a day.

Rodriguez later filed a claim for workers' compensation benefits alleging that she sustained compensable injuries to her low back, hip, and neck as a result of the March 22, 2005, incident. McDaniel controverted her claim alleging that there were no objective medical findings establishing that Rodriguez sustained a compensable injury.

At the hearing before the ALJ, Rodriguez testified that she slipped and fell as she turned to grab some wipes. She said that she hit her right hip and neck against the line as she fell. She said that, immediately thereafter, she began experiencing pain that radiated from her neck through her right hip and down into her legs. She

also said that her right hip and neck were swollen. Rodriguez testified she reported that her neck and hip were hurting. She said that, while waiting in the emergency room, she walked around to ease her pain. She admitted that the hospital released her to return to work but said that she did not return to work the following day because she was unable to get out of bed. She stated that she had pain in her neck, right hip and legs when she saw Dr. Yawn three weeks after the accident. She also stated that she continued to have swelling in her right hip and neck.

Rodriguez said that she tried to return to work following her visit with Dr. Yawn but was told that she could not have her job back. She said that Temps for Hire was unable to contact her following her accident because her daughter's telephone was disconnected. She also said that she missed her second visit with Dr. Yawn because she was told she was responsible for paying for the visit.

Melinda McDaniel testified that she was the operations manager for Temps for Hire. She said that she had just left the Stribling facility on March 22, when she was notified via telephone that someone had been hurt. She returned to Stribling and upon arrival, she spoke to Rodriguez. She said Rodriguez never indicated that she had fallen to the floor. She also said that when asked what was hurting, Rodriguez pulled up her shirt and pointed at her right hip. She said that when Rodriguez did this, she "did not observe any marking indicating that [Rodriguez] had been struck." She said that Rodriguez never indicated she was having pain or discomfort in her neck, head, shoulder, or legs.

McDaniel testified that she drove Rodriguez to the emergency room and was present when Rodriguez described her injuries to the emergency room staff. She said that she and Rodriguez sat in the emergency room for five hours and that, during that time, Rodriguez would get up and walk around with no apparent physical distress. McDaniel testified that she was given a copy of Rodriguez's emergency room report after her examination. She said the report indicated that Rodriguez could return to work the following day. McDaniel testified that Rodriguez said she could not return to work when informed of the information contained in the report.

McDaniel said that she called Rodriguez the following day and was told that Rodriguez was ill and unable to work. She called again the next day and offered Rodriguez a position at a different

facility, and Rodriguez's daughter said that Rodriguez was still ill. McDaniel testified that she continued to call and offer Rodriguez work but each time was given an excuse as to why Rodriguez could not work. She said that eventually Rodriguez and her family stopped taking her calls. She said that they answered her calls only when she blocked her telephone number from being displayed on their caller identification. McDaniel testified that a month after Rodriguez's last doctor's visit, Rodriguez called in the middle of the afternoon inquiring about the availability of work. Rodriguez was told to call back the following morning between 6 a.m. and 7 a.m., pursuant to company procedure, which was explained to Rodriguez during orientation.

Dr. Yawn testified that he saw Rodriguez on April 11, 2005. At the time of the visit, he did not have Rodriguez's emergency room records but he had a note from his secretary indicating that Rodriguez was seen in the emergency room. The note briefly explained what the emergency room had found. Dr. Yawn stated that his opinions were based upon his own evaluation of Rodriguez.

Dr. Yawn testified that, in the history he received from Rodriguez, she indicated that she had slipped and hit the side of the line where she was working and then fell on a pallet, striking her lower back or right hip. He said that Rodriguez stated that she began experiencing neck pain the day after her accident. He said that, during her visit, Rodriguez complained of low back pain, some pain in her neck, and pain in her right hip. He also said she indicated that she had pain radiating down into her right leg. Dr. Yawn stated that, during his examination, he checked Rodriguez's vital signs, examined her neck, abdomen, back, and extremities, and conducted a neurological examination.

During his examination, Dr. Yawn noted some mild tenderness in the back part of Rodriguez's neck, which was based upon Rodriguez's responses. Dr. Yawn testified that he did not observe any muscle spasms during his examination of Rodriguez. He explained that:

> I noted during the exam, that she had some mild tenderness of the posterior, which is the back part of the neck, on her neck muscles. I reached that opinion based upon her responses. It's more of an objective tenderness versus pain. Pain is more subjective whereas tenderness is an objective type finding. It may be from grimacing, but there is obviously some subjective input also when we are

evaluating for tenderness where a patient is, it is what we call guarding, someone is guarding or pulling away or grimacing there. They are [a] patient's responses to what I am doing. There is a difference [in] finding of tenderness than actually observing a physical abnormality, in the form of a muscle spasm that I am able to see.

Dr. Yawn further testified that he gave Rodriguez a range-of-motion examination and that the range-of-motion exam was active because the patient controlled it. He said that when he had Rodriguez bend over and touch the floor with her fingers, she could flex only a few inches at the waist. He said that he then had her lean backwards and that she exhibited minimal extension due to pain. He also said that there were no abnormalities in the range-of-motion of her neck. Dr. Yawn testified that, during her straight-leg-raise exam, Rodriguez could only lift her feet a few inches from the horizontal position. He said that she complained of pain on both sides and that her straight-leg raise exam was positive based on her subjective complaints of pain. Dr. Yawn said that the level of symptoms described to him by Rodriguez was out of proportion to his findings. As an example, he explained that during a typical straight-leg-raise exam, he would not expect to see pain elicited with bringing the foot only a few inches from the table.

Dr. Yawn testified that Rodriguez's neurological examination was within the normal limits. He did not remember visually examining her right hip but stated that his diagnosis of a contusion did not necessarily mean that he had viewed a disturbance in the skin and tissue. Dr. Yawn testified that he had reviewed the first five pages of the emergency room notes. He said that there were no indications that the doctors or nurses observed any muscle spasms. During his testimony, he stated:

> The fact that the physician prescribed Robaxin in this case does not mean that [the] physician personally observed muscle spasms. It is just part of normal and usual medical protocol when you have a particular type of subjective complaints. Robaxin is typically a muscle relaxer; someone might be using it for some other reason I am not aware of, but it is by far a muscle relaxer. It can provide a benefit as a pain reliever. It is primarily a muscle relaxer, but it has an ancillary property that helps with pain as well. When a physician prescribes a muscle relaxer in the absence of the physician having personally observed or having reported a muscle spasm or having heard from a nurse she or he observed muscle spasms, it is a prophylactic measure and . . . used as needed.

He said that the x-ray taken at the hospital was normal but that the portion of the hospital record entitled "clinical impression," said that she had a "hip contusion on the right." He explained that such a notation referred to tenderness and not to visible darkening or bruising. He stated that:

> What we can gather from the emergency room doctor's report is . . . there was tenderness on the right hip but not necessarily discoloration according to the physical exam. If there had been discoloration I would expect it to say on the physical exam portion "Bruising" or some note in that area. Particularly in the portion of the physical exam, [it] says "Hip tenderness" and then there was a space beside that. Typically we would say there was swelling or discoloration, contusion, or something along those lines to indicate there was more than that.

The ALJ found that Rodriguez's injuries were not compensable because she failed to present objective findings establishing that she sustained compensable injuries. The Commission affirmed and adopted the ALJ's decision. Rodriguez brings this appeal from that decision.

In workers' compensation cases, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and affirm the decision if it is supported by substantial evidence. *Allen Canning Co. v. Woodruff*, 92 Ark. App. 237, 212 S.W.3d 25 (2005). Substantial evidence is that which a reasonable person might accept as adequate to support a conclusion. *Wal-Mart Stores, Inc. v. Sands*, 80 Ark. App. 51, 91 S.W.3d 93 (2002). We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Crawford v. Single Source Transp.*, 87 Ark. App. 216, 189 S.W.3d 507 (2004). When the Commission affirms and adopts the ALJ's opinion as the decision of the Commission, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *Fayetteville Sch. Dist. v. Kunzelman*, 93 Ark. App. 160, 217 S.W.3d 149 (2005). Therefore, in reviewing the case, we consider both the ALJ's decision and the Commission's majority opinion. *Id.*

Rodriguez argues that the Commission erred in finding that she failed to set forth objective findings supporting compensable injuries to her neck and hip. Rodriguez, as the claimant, had the

burden of proving by a preponderance of the evidence that she sustained compensable injuries. *See Crawford, supra.* A compensable injury must be established by medical evidence supported by objective findings. Ark. Code Ann. § 11-9-102(4)(D) (Supp. 2005); *see also Watson v. Tayco, Inc.,* 79 Ark. App. 250, 86 S.W.3d 18 (2002). Objective findings are those findings that cannot come under the voluntary control of the patient. Ark. Code Ann. § 11-9-102(16)(A)(i) (Supp. 2005); *see also Watson, supra.*

Rodriguez argues that she set forth two objective findings supporting her claim of a compensable injury. First is the evidence that she was prescribed Robaxin, which is a medication used to treat muscle spasms, and second is the emergency room report noting a contusion to her hip. In support of her argument she relies on *Fred's Inc. v. Jefferson,* 361 Ark. 258, 206 S.W.3d 238 (2005). In *Fred's,* our supreme court held that although the physician failed to state the specific purpose for which the medication was prescribed, a reasonable inference was that the medication was prescribed to treat the claimant's present injury.

As in *Fred's,* there is nothing in the medical records indicating why Rodriguez was prescribed the medication at issue. This case is distinguishable from *Fred's,* however, because there was medical testimony in this case indicating that Robaxin could be prescribed for prophylactic purposes. Dr. Yawn testified that Robaxin was a general muscle relaxer and that nothing in the emergency room records indicated that Rodriguez was experiencing muscle spasms. He testified that when Robaxin is prescribed in the absence of muscle spasms, it is a prophylactic measure.

As to Rodriguez's second issue, that there is an emergency room report noting a contusion to her hip, Dr. Yawn testified that the notation in the record most likely referred to tenderness and not to visible darkening or bruising. Dr. Yawn testified further that Rodriguez's neurological examination was within the normal limits. It is the Commission's function to determine witness credibility and the weight to be afforded to any testimony. *DeQueen Sand & Gravel v. Cox,* 95 Ark. App. 234, 236 S.W.3d 5 (2006). The Commission must weigh the medical evidence and, if such evidence is conflicting, its resolution is a question of fact for the Commission. *Allen Canning Co., supra.* The Commission's resolution of the medical evidence has the force and effect of a jury verdict. *Id.* Here, the Commission chose to believe the testimony of Dr. Yawn. In light of Dr. Yawn's testimony, we

must conclude that reasonable minds could have reached the same conclusion as the Commission. Therefore, we affirm.

Affirmed.

VAUGHT and HEFFLEY, JJ., agree.